IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 1:20-cv-002636 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ESTATE OF PAUL DOBRESCU, | ) | |
| Deceased; | ) | |
| COSMIN DOBRESCU, as the *de facto* | ) | |
| EXECUTOR or ADMINSTRATOR of | ) | |
| ESTATE OF PAUL DOBRESCU, deceased; | ) | |
| ESTATE OF OLGA DOBRESCU, | ) | |
| Deceased; and, | ) | |
| COSMIN DOBRESCU, as the *de facto* | ) | |
| EXECUTOR of AMINISTRATOR of | ) | |
| ESTATE OF OLGA DOBRESCU, deceased, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**COMPLAINT**

The plaintiff United States of America, at the direction of a delegate of the Attorney

General and with the authorization of a delegate of the Secretary of the Treasury, pursuant to 31

U.S.C. §§ 5321(b)(2) and 3711(g)(4)(C), brings this civil action to collect civil penalties, plus

statutory additions, assessed against Paul Dobrescu, deceased, and Olga Dobrescu, deceased.

The civil penalties were assessed on account of Paul Dobrescu and Olga Dobrescu's failure to

timely report their financial interest in two foreign bank accounts as required by 31 U.S.C.

§ 5314 and its implementing regulations.  For its complaint, the United States alleges as follows:

**Jurisdiction, Venue, and Parties**

1.      The Court has jurisdiction under 28 U.S.C. §§ 1331, 1345, and 1355 because it

arises under a federal statute, the United States is the plaintiff, and the action seeks recovery or

enforcement of civil penalties.

1

2.     A substantial part of the events or omissions giving rise to the claims at issue occurred in Cook County, Illinois. Olga Dobrescu died in Cook County, Illinois, and prior to the deaths of Paul Dobrescu and Olga Dobrescu and during the events alleged herein, the Dobrescus owned property in and/or resided at several locations in Chicago, Illinois.

3.     The Dobrescus' son and sole surviving heir, Cosmin Dobrescu, resides in Chicago, Illinois, within the jurisdiction of this Court. Cosmin Dobrescu is being sued in his capacity as the *de facto* executor or administrator of the Estate of Paul Dobrescu, deceased, and as the *de facto* executor or administrator of the Estate of Olga Dobrescu, deceased.

4.     The Northern District of Illinois is a proper venue for this action under 28 U.S.C. §§ 1391(b)(2) and 1391(c)(1).

5.     Paul Dobrescu was a United States citizen at all times relevant to this action, was married to Olga Dobrescu, and passed away on February 19, 2017, in Hillsborough County, Florida.

6.     Olga Dobrescu was a United States citizen at all times relevant to this action, was married to Paul Dobrescu, and passed away on September 8, 2014, in Cook County, Illinois.

7.     The defendants Estate of Paul Dobrescu, deceased, and Estate of Olga Dobrescu, deceased, own or owned property located in Cook County, Illinois, within the jurisdiction of this Court, and that property was sold by Cosmin Dobrescu, and/or is being controlled by, and/or is in the possession of Cosmin Dobrescu.

8.     On July 14, 1992, Olga Dobrescu as Testatrix, executed the "Last Will and Testament of Olga Dobrescu," naming Paul Dobrescu as Executor, and Cosmin Dobrescu as Executor if Paul Dobrescu were unable or unwilling to serve as Executor. Upon information and

belief, Olga Dobrescu's will was not proved and no probate case has ever been commenced for her estate.

9.      No will of Paul Dobrescu has not been located, but one may exist because a law firm drafted wills for Olga Dobrescu and Paul Dobrescu at the same time.

10.     Upon information and belief, no probate case has ever been commenced for the estate of Paul Dobrescu, deceased.

11.     If it is determined that either Paul Dobrescu or Olga Dobrescu died intestate, under relevant state law, Cosmin Dobrescu is the sole heir and distributee of the property of the estates of Paul Dobrescu and Olga Dobrescu, deceased.

**<u>Legal Duty to Report Foreign Bank Accounts</u>**

12.     Section 5314 of Title 31 of the U.S. Code authorizes the Secretary of the Treasury to require United States persons to report certain transactions with foreign financial entities. Under the statute's implementing regulations, "[e]ach United States person having a financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country shall report such relationship to the Commissioner of Internal Revenue for each year in which such relationship exists." 31 C.F.R. § 1010.350(a).

13.     To fulfill this requirement, a U.S. person must file a "Report of Foreign Bank and Financial Accounts," commonly known as an "FBAR." *See id.*

14.     An FBAR requires a U.S. person to disclose, among other things, the maximum value of each foreign account during the calendar year reported, the type of account, the name of the financial institution in which the account is held, the account number, and the mailing address of the financial institution in which the account is held. *See* Form TD-F 90-22.1.

15.     For the calendar years 2011 and 2012, an FBAR was due by June 30 "of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year." 31 C.F.R. § 1010.306(c).

16.     Schedule B is an attachment to the individual federal income tax return (Form 1040) that taxpayers use for reporting, among other things, interest and dividend income, as well as the existence of any financial interest in or signature or other authority over financial accounts located in foreign countries. During calendar years 2011 and 2012, Schedule B referred to the FBAR filing requirement and alerted a taxpayer who met the definition of a U.S. Person and who had an interest in or signature or other authority over a financial account located in a foreign country to see the instructions for the exceptions and filing requirements for the FBAR.

17.     Section 5321(a)(5) of Title 31 authorizes the imposition of civil penalties for failure to comply with the reporting requirements of § 5314. The amount of the penalty is capped at the greater of $100,000 or 50% of the balance in the account at the time of the violation pursuant to 31 U.S.C. § 5321(a)(5)(C)

18.     The penalty under 31 U.S.C. § 5321(a)(5) is subject to statutory additions, including interest and late-payment penalties pursuant to 31 U.S.C. § 3717.

**Factual Background**

19.     Paul Dobrescu was a doctor of veterinary medicine, and operated Community Pet Hospital, Inc., an Indiana domestic-for-profit corporation conducting business in Munster, Indiana. Upon information and belief, Paul and Olga Dobrescu were employed by Community Pet Hospital, Inc.

20.     As early as 1986, Paul and Olga Dobrescu had a financial and beneficial interest in, and control and signatory authority, over two Registered Retirement Saving Plans with TD

4

Canada Trust. Paul Dobrescu and Olga Dobrescu held/owned/possessed signatory authority over the accounts ending in 4108 and 4047 from 1986 through at least the end of 2014.

21.     As early as 2005, Paul and Olga Dobrescu had a financial and beneficial interest in, and control and signatory authority, over multiple bank accounts with Credit Suisse AG, and UBS AG, both in Switzerland. Paul Dobrescu and Olga Dobrescu held/owned/possessed signatory authority over the numbered Credit Suisse account ending in 0444, held under the pseudonym "Watertiger," from 2005. The Credit Suisse account was closed in 2009. Paul Dobrescu and Olga Dobrescu held/owned/possessed signatory authority over the numbered UBS accounts ending in 4-632 and 2684, from 2005. The UBS accounts were closed in 2009.

22.     Paul and Olga Dobrescu had a financial and beneficial interest in, and control and signatory authority, over a joint bank account they opened in May, 2009, at Banque Cantonale de Geneva ("BCGE") in Switzerland. Paul Dobrescu and Olga Dobrescu held/owned/possessed signatory authority over the numbered BCGE account ending in 9318, held under the pseudonym "Bulica 6021" from 2009. The BCGE account was still open as-of December 1, 2014.

23.     Paul and Olga Dobrescu had a financial and beneficial interest in, and control and signatory authority, over a joint bank account they opened on May 27, 2009, at Banque Cantonale Vaudoise ("BCV") in Switzerland. When the BCV account ending in 3270 was opened, Paul and Olga Dobrescu supplied BCV with an address in Canada, as opposed to their residence in Calumet, Indiana. The BCV 3270 account was also referred to internally by BCV as "BCV-888," was opened in-person by Paul and Olga Dobrescu in Lausanne, Switzerland, on May 27, 2009, and this account was funded with amounts from the Dobrescus' Credit Suisse account, described above. Paul and Olga Dobrescu paid a fee to BCV for it to hold all account correspondence at the bank for in-person review, rather than by sending the correspondence by

mail to the United States. This fee was in addition to the standard account administration fee required by BCV. Paul Dobrescu and Olga Dobrescu held/owned/possessed signatory authority over the BCV account ending in 3270 from 2009, until it was closed in 2010.

24. The BCV account ending in 3270 was closed by Paul and Olga Dobrescu on or about April 23, 2010. Prior to that date, on April 12, 2010, a joint account in the names of Paul Dobrescu, Olga Dobrescu, and Cosmin Dobrescu, was opened at BCV ending in 4351; it was a numbered and hold-mail account held under the pseudonym "Bulica 4351," and was also referred to internally by BCV as "BCV-5373." When opening the account, the Dobrescus supplied BCV with an address in Canada, as opposed to their residence in Calumet, Indiana. The Bulica 4351 account at BCV was opened in-person by the Dobrescus via their three signatures made in Lausanne, Switzerland, on April 12, 2010. The Dobrescus paid fees to BCV for the use of a numbered/pseudonym account, and for BCV to hold all account correspondence at the bank for in-person review, rather than by sending the correspondence by mail to the United States. These fees were in addition to the standard account administration fee required by BCV. The Bulica 4351 account at BCV was still open as-of December 1, 2014; however, on March 31, 2015, an outbound wire transfer in the amount of €475,316 was sent to First Midwest Bank, a U.S. registered bank, headquartered in Chicago, Illinois.

25. For all relevant years, Paul Dobrescu and Olga Dobrescu generally filed their federal income tax returns.

26. Paul Dobrescu and Olga Dobrescu, however, never reported their financial interest or authority over any foreign bank account, either on Schedule B of their tax returns or by timely filing an FBAR for the years 2005–2012, inclusive.

**The Dobrescus' Foreign Financial Account balances exceeded $10,000 in 2011 and 2012**

27.     In calendar year 2011, Paul Dobrescu and Olga Dobrescu had a financial and

beneficial interest in, and control and signatory authority over, foreign bank accounts as follows:

| Bank Name | Account Number | Maximum Balance During 2011 | Date Opened | Date Closed | Bank Location |
|---|---|---|---|---|---|
| BCGE | x9318 | $963,440.00 | May 2009 | Open as-of December 1, 2014 | Switzerland |
| BCV | x4351 | $591,522.48 | April 12, 2010 | Open as-of December 1, 2014 | Switzerland |

28.     These accounts had balances exceeding $10,000. The aggregate balance of the

two accounts exceeded $1,554,962.

29.     In calendar year 2012, Paul Dobrescu and Olga Dobrescu had a financial and

beneficial interest in, and control and signatory authority, over foreign bank accounts as follows:

| Bank Name | Account Number | Maximum Balance During 2012 | Date Opened | Date Closed | Bank Location |
|---|---|---|---|---|---|
| BCGE | x9318 | $899,512.00 | May 2009 | Open as-of December 1, 2014 | Switzerland |
| BCV | x4351 | $613,715.22 | April 12, 2010 | Open as-of December 1, 2014 | Switzerland |

30.     These accounts had balances exceeding $10,000.  The aggregate balance of the

two accounts exceeded $1,513,227.

**The Dobrescus' Financial Dealings with Swiss Banks**

31.     The IRS uses a "John Doe" summons to obtain information about possible tax

fraud by people whose identities are unknown. On June 30, 2008, the United States Department

of Justice filed papers seeking an order from the United States District Court for the Southern

District of Florida, authorizing the IRS to use a "John Doe" summons to request information

from the Zurich, Switzerland-based bank UBS AG about United States taxpayers who may be using Swiss bank accounts to evade federal income taxes.

32.     UBS AG was Switzerland's largest bank; the IRS sought issuance of a "John Doe" summons because it was concerned with whistleblower reports that UBS was using is cross-border banking units in combination with Swiss financial privacy laws to help U.S. taxpayers conceal foreign bank accounts in order to avoid paying income and capital gains taxes on the money held in offshore accounts.  On July 1, 2008, the IRS was granted permission by the United States District Court for the Southern District of Florida to serve a "John Doe" summons upon UBS in Switzerland for records of United States persons who maintained accounts with UBS; the "John Doe" summons ultimately lead to the filing of a one-count criminal information against UBS in the Southern District of Florida for conspiracy to defraud the United States and the Internal Revenue Service in the ascertainment, computation, assessment and collection of federal income taxes under 18 U.S.C. § 371; the United States and UBS subsequently entered into a deferred prosecution agreement on February 18, 2009.  *See generally United States v. UBS AG*, Case 0:09-cr-60033-JIC (S.D. Fla. Feb. 18, 2009); *also Id.* at Doc. 20, ¶¶1-2, 13; Doc. 20, Exhibit B, ¶¶ 3-12.

33.     As a condition of UBS's deferred prosecution agreement, UBS agreed to a statement of facts outlining the methods of its conspiracy to aid U.S. Persons in concealing their accounts at UBS in order to avoid paying income taxes on the income derived from the accounts, and to conceal the existence of the accounts from the United States.  *Id.* at Doc. 20, Exhibit C.

34.     As a result of its deferred prosecution agreement with the United States, UBS also submitted for Court approval a notice letter to be sent to U.S. Person accountholders, advising them that UBS was closing down its cross-border operations.  *Id.* at Doc. 20, Exhibit D.  U.S.

Person accountholders who wished to remain an accountholder at UBS were advised that their accounts at UBS's cross-border units based in Switzerland would be terminated, and the accounts would then be transferred to one of UBS's subsidiaries that was registered as a U.S.-regulated business with assets held at a UBS office in New York, and that the U.S. Person accountholder would have to fill out a Form W-9 and disclose to the IRS that the accounts were held by U.S. Persons, and would be subject to U.S. taxation. *Id.* at Doc, 20, pg. 41 of 43. Further, regardless of whether U.S. Person accountholders at UBS decided to keep their accounts at UBS's U.S. registered business unit, accountholders were advised to consult with a qualified U.S. tax advisor to determine any tax consequences in connection with the closure of their Swiss-based UBS accounts, as well to discuss with their advisers whether any account reporting and disclosure obligations for prior tax years needed to be amended. *Id.* at pg. 42 of 43. Finally, UBS advised its U.S. Person account holders of the existence of the IRS's voluntary disclosure programs that could be utilized to provide relief for applicable penalties and fines on account of their past concealment of accounts at UBS, and that going forward, UBS would continue to cooperate with the IRS and United States, and that once a U.S. Person accountholder's information was shared with the IRS pursuant to the "John Doe" summons, participation in the IRS voluntary disclosure programs would be unavailable. *Id.*

35.     Upon information and belief, UBS AG sent a version of this information letter to all UBS U.S. Person account holders, to include Paul Dobrescu and Olga Dobrescu, sometime shortly after it was filed with and approved by the district court in February 2009.

36.     UBS AG was not the only Swiss bank that was under investigation by the United States and the IRS; Credit Suisse AG similarly entered into a deferred prosecution agreement with the United States pursuant to a one-count criminal information filed in the United States

District Court for the Eastern District of Virginia. *See United States v. Credit Suisse AG*, Case 1:14-cr-00188-RBS (E.D. Va. May 19, 2014).

37. As set forth in the statement of facts, *see Id.* at Doc. 14, Credit Suisse admitted that it engaged in similar practices to UBS by aiding U.S. Person accountholders to conceal their foreign accounts held in Switzerland and the income derived thereon from the United States and the IRS. *Id.* In fact, Credit Suisse admitted that it was aware of and monitoring the UBS criminal case in 2008, and in the Spring of 2009, after the UBS deferred prosecution agreement described above in ¶¶31-34 was made public, Credit Suisse advised its U.S. Person accountholders that they must transfer their assets held by Credit Suisse in Switzerland to one of Credit Suisse's U.S.-registered affiliated banks and become U.S. tax-compliant, or the U.S. Persons must leave Credit Suisse. *United States v. Credit Suisse AG*, Case 1:14-cr-00188-RBS (E.D. Va. May 19, 2014), Doc. 14 at ¶58.

38. Credit Suisse also admitted that certain Credit Suisse private account managers who oversaw undeclared U.S. Person accounts, advised and assisted the U.S. Person accountholders who wished to continue concealing their assets from the United States and the IRS, by identifying other offshore financial institutions in Switzerland (or elsewhere) that did not comply with U.S. tax and disclosure laws, and that would accept new U.S. Person accountholders; the efforts of these Credit Suisse employees aided these U.S. Person accountholders from further disclosing their Swiss-based accounts to the IRS and paying taxes thereon. *Id.* at ¶60.

39. BCV also eventually entered into an agreement with the United States as part of the U.S. Department of Justice–Tax Division's "Swiss Bank Program" in December 2013; by entering the Swiss Bank Program, BCV agreed to a non-prosecution agreement and avoided the

filing of a criminal information by coming into compliance with U.S. tax and account disclosure laws, and by paying restitution of $41,677,000. *See Banque Contonale Vaudoise DOJ-Swiss Bank Program – Category 2 Non-Prosecution Agreement*, dated December 21, 2015, *available at* www.justice.gov/tax/Swiss-Bank-Program, Entry #73 (last visited April 29, 2020).

40.    In its non-prosecution agreement and statement of facts, BCV admitted that it assisted U.S. Person accountholders in committing offenses under Titles 18, 26, and 31 of the United States Code, for tax-related and monetary transaction offenses by allowing undeclared U.S. related accounts to be held at BCV. *Id.*

41.    In the statement of facts annexed to its non-prosecution agreement, BCV admitted that despite being a Swiss Cantonal Bank that was required to serve primarily local residents of the Swiss Canton of Vaud, it had approximately 2,088 U.S. related accounts prior to 2013, when BCV entered the Swiss Bank Program; and that BCV was aware that these U.S. Person accountholders had a legal duty to report their accounts to the IRS and to pay taxes on income derived from accounts held at BCV. *See Id.*, statement of facts, at ¶¶1, 13-17. BCV also admitted that it offered services that aided U.S. Person account holders in concealing their accounts from the United States and IRS, including, but not limited to: (1) providing hold-mail service to 358 U.S. Person accountholders, so that all BCV account-related documents would be held at BCV in Lausanne, to be reviewed in-person at the bank, rather than being sent via mail to the United States; (2) maintaining 228 numbered accounts for U.S. Person accountholders, and allowing a smaller number to utilize code names for the accounts rather than their name and account number; and, (3) maintaining 186 accounts for U.S. Person accountholders that were both hold-mail and numbered/pseudonym accounts. *Id.* at ¶18. BCV also admitted that it was aware of ex-UBS account holders who transferred their accounts from UBS to BCV once the

"John Doe" summons and UBS criminal case became public knowledge in 2008 and 2009, and allowed these UBS U.S. Person accountholders to open accounts at BCV without determining whether they were U.S.-tax compliant. *Id*. at ¶¶20-22.

42. Once BCV announced it was entering the Swiss Bank Program in December 2013, it began to impose strict requirements on U.S. Person accountholders where the accountholder was not a Swiss resident, and ensured that the accounts at BCV were tax compliant, or the accounts were closed. *Id*. at ¶¶28-32. BCV also informed U.S. Person accountholders that in addition to the requirements that their accounts at BCV must comply with U.S. law, that the IRS was offering the Offshore Voluntary Disclosure Program, wherein the BCV clients could become compliant with U.S. tax and account reporting laws, and pay back taxes, penalties, and interest in connection with failing to disclose their accounts at BCV. *Id*. at ¶33.

43. Paul and Olga Dobrescu held accounts at UBS and Credit Suisse prior to, and up through, May 2009.

44. On information and belief, Paul Dobrescu and Olga Dobrescu were aware of UBS's deferred prosecution agreement and received the UBS notice letter described above in ¶¶34-35 in or before May 2009.

45. On information and belief, Paul and Olga Dobrescu also received the notification from Credit Suisse set forth in ¶37, above, in or before May 2009.

46. As a result of being notified by UBS and Credit Suisse that they must bring their accounts into compliance with U.S. tax and account disclosure laws, upon information and belief, Paul and Olga Dobrescu closed their accounts at UBS and Credit Suisse in May 2009, and

transferred the assets in the UBS and Credit Suisse accounts to BCV and BCGE, in order to continue concealment of these accounts from the IRS and United States.

47.     Upon information and belief, Paul and Olga Dobrescu maintained one of the 186 accounts at BCV that were both hold-mail and numbered accounts, as described in ¶41, above, and they were notified in or before December 2013, that BCV intended to disclose their account(s) to the United States, and that the Dobrescus should consider entering one of the IRS's offshore disclosure programs.

### The Dobrescus' Interactions with the IRS Regarding Their Foreign Accounts

48.     On February 13, 2014, Paul Dobrescu and Olga Dobrescu applied for acceptance into the IRS Criminal Investigation Division's 2012 Offshore Voluntary Disclosure Program ("OVDP").

49.     Paul Dobrescu and Olga Dobrescu were accepted into ODVP on April 30, 2014.

50.     As part of their participation in ODVP, the Dobrescus filed delinquent FBARs for 2005–2012, and filed amended federal income tax returns for the 2005–2012 tax years.

51.     As part of their disclosures, Paul Dobrescu and Olga Dobrescu disclosed their unreported offshore accounts at TD Canada Trust, UBS, Credit Suisse, BCV, and BCGE.

52.     As part of their disclosures, Paul Dobrescu and Olga Dobrescu admitted that they engaged in many of the activities set forth in the statements of facts agreed to by UBS, Credit Suisse, and BCV, in connection with their deferred prosecution or non-prosecution agreements with the United States, that were designed to allow U.S. Person accounts to remain concealed from the United States; the Dobrescus disclosed that they engaged in the following activities, including:

        a.   Only communicating with the Swiss banks in-person or on the telephone;

13

b.  Meeting with Swiss bank private account managers when these managers travelled from Switzerland to the United States;

c.  Only reviewing account-related documents in-person while travelling abroad;

d.  Failing to retain account documents provided by the banks;

e.  Only making deposits and withdrawals from Swiss accounts in person by cash or check;

f.  Declining to receive wire transfers to the United States from their Swiss accounts;

g.  Agreeing to use hold-mail services and only conduct face-to-face meetings regarding their Swiss accounts at the suggestion of bank employees; and,

h.  Being influenced by Swiss bank employees to move their accounts from one foreign financial institution to another.

53.     Paul Dobrescu Olga Dobrescu informed the IRS that the source of the funds in their Swiss accounts were their life savings, and that Cosmin Dobrescu was listed as a joint account holder on some of the accounts for estate planning purposes, but that he did not have an ownership interest in the accounts, and rather only had signature authority.

54.     The Dobrescus were initially cooperative with the IRS during OVDP, which included a trip to Switzerland by Paul Dobrescu and Cosmin Dobrescu in March 2016, in order to obtain account documents from the Swiss banks.

55.     However, on account of the fact that Olga Dobrescu, and subsequently Paul Dobrescu, passed away, and because Cosmin Dobrescu did not formally open probate cases in regard to his parents, nothing was resolved.  The IRS ultimately removed the Dobrescus from OVDP.

56. The IRS initiated a civil FBAR and tax examination of the estates of Paul and Olga Dobrescu after they were removed from ODVP.

57. As a result of the examination, it was determined for the years where the income tax assessment statute was open, the Dobrescus owed an additional income tax liability for their 2011 and 2012 tax periods, on account of the interest income they failed to report on their income tax returns.

58. Prior to their deaths, the United States became the Dobrescus' creditor on or before June 30, 2012, the date their 2011 FBAR was due.

59. Upon information and belief, after the United States became the Dobrescus' creditor, the Dobrescus or their Estates had an ownership interest in nine or more real properties, in Illinois and other states which were subsequently transferred or sold by Cosmin Dobrescu.

60. Cosmin Dobrescu had knowledge of his parents having been accepted into the IRS OVDP prior to their deaths, because he corresponded with the IRS regarding the FBAR examination generally, and about the requirement for Cosmin Dobrescu to probate the wills of first Olga Dobrescu, and then later Paul Dobrescu, because he travelled to Switzerland to obtain bank documents to submit to the IRS, and was or is exercising dominion and control of the assets of the Estates of Paul Dobrescu and Olga Dobrescu, deceased.

**The Dobrescus' Failure to Report Their Interest in Foreign Financial Accounts was Willful**

61. For calendar year 2011:

   a. Paul Dobrescu and Olga Dobrescu had a financial interest in, and signatory authority over, all the accounts listed in ¶27 above. These accounts had balances exceeding $10,000. The aggregate balance of the three accounts exceeded $1,554,962.

15

b. Paul Dobrescu and Olga Dobrescu failed to disclose any foreign accounts on Schedule B of their 2011 federal income tax return (Form 1040). Although Paul and Olga Dobrescu attached a Schedule B to their joint 2011 return, they checked "No" in response to the question that asked whether they had an interest in or authority over a foreign financial account.

c. Paul Dobrescu and Olga Dobrescu were required to file an FBAR by June 30, 2012, reporting their interest in the two accounts for the 2011 calendar year, but they failed to do so.

d. Upon information and belief, Paul and Olga Dobrescu were informed by their tax return preparer in writing about the requirement to report the existence of and income derived from their accounts at BCV and BCGE, but the accounts were not disclosed to the return preparer in connection with the preparation of their 2011 income tax return.

62. For calendar year 2012:

a. Paul Dobrescu and Olga Dobrescu had a financial interest in, and signatory authority over, the two accounts listed in ¶29 above. These accounts had balances exceeding $10,000. The aggregate balance of the two accounts exceeded $1,513,227.

b. Paul Dobrescu and Olga Dobrescu failed to disclose any foreign accounts on Schedule B of their 2012 federal income tax return (Form 1040). Although Paul and Olga Dobrescu attached a Schedule B to their joint 2012 return, they checked "No" in response to the question that asked whether they had an interest in or authority over a foreign financial account.

c. Paul Dobrescu and Olga Dobrescu were required to file an FBAR by June 30, 2013, reporting their interest in the two accounts for the 2012 calendar year, but they failed to do so.

d. Upon information and belief, Paul and Olga Dobrescu were informed by their tax return preparer in writing about the requirement to report the existence of and income derived from their accounts at BCV and BCGE, but the accounts were not disclosed to the return preparer in connection with the preparation of their 2012 income tax return.

63.     Paul Dobrescu, deceased, and Olga Dobrescu, deceased, failed to timely report their financial interest in the foreign bank accounts during 2011 and 2012, and such failure was willful within the meaning of 31 U.S.C. § 5321(a)(5).

**Claim for Relief:**
**Reduce FBAR Civil Penalties to Judgment Against Estates and Cosmin Dobrescu**
**as the _de facto_ Representative of the Estates of Paul Dobrescu and Olga Dobrescu**

64.     At all relevant times, Paul Dobrescu and Olga Dobrescu were United States persons and were subject to the jurisdiction of the United States within the meaning of 31 C.F.R. §1010.350.

65.     In 2011, Paul Dobrescu and Olga Dobrescu had an interest in at least two foreign accounts in Switzerland (identified above in ¶27) in which the aggregate balance exceeded $10,000.

66.     In 2012, Paul Dobrescu and Olga Dobrescu had an interest in at least two foreign accounts in Switzerland (identified above in ¶29) in which the aggregate balance exceeded $10,000.

67. Paul Dobrescu and Olga Dobrescu were required to report to the United States their interest in the two foreign accounts in FBARs filed on or before June 30, 2012, and June 30, 2013, respectively.

68. Prior to entering ODVP in 2014, Paul and Olga Dobrescu made no attempt to timely file FBARS.

69. Upon information and belief, after becoming aware of the requirements, by way of their accounts at UBS and Credit Suisse, to report their foreign accounts to the United States in a timely filed FBAR, and to report their interest income to the IRS on their personal income tax returns, Paul Dobrescu and Olga Dobrescu took additional steps to keep their offshore assets concealed from the United States, and transferred their accounts from large multinational Swiss banks to small cantonal Swiss Banks.

70. The Dobrescus' failure to report these accounts in a timely-filed FBAR was willful within the meaning of 31 U.S.C. § 5321(a)(5).

71. The IRS determined that the BCV and BCGE accounts were jointly owned, with 50 percent attributable to each spouse, because the account balances represented the savings of only Paul Dobrescu and Olga Dobrescu.

72. The IRS determined that Paul Dobrescu and Olga Dobrescu each owned 50 percent of the highest account balance in each of the BCV and BCGE accounts for 2011 and 2012, and that each spouse should be separately assessed a penalty on only their 50 percent of the balance owned by each spouse.

73. The IRS also utilized the discretion afforded to the Secretary of the Treasury, to determine less than the full statutory penalty based off of 50% of the balance in each account for each violation in 2011 and 2012 (four violations in total). Rather, the IRS determined that a

penalty of fifty percent of the highest aggregate account balance for 2011 or 2012, would be apportioned to each spouse separately and spread over the 2011 and 2012 calendar year penalties.

74.    The Dobrescus' foreign account balances totaled $1,554,962.00 in 2011, and $1,513,227.00 in 2012.  The penalty was, therefore, computed as 50% of the aggregate balance in 2011, as this was the year with the highest aggregate account balance.  This resulted in a total penalty of $777,481, apportioned equally (50/50) to Paul Dobrescu and Olga Dobrescu, on a per-account basis, and apportioned to 2011 and 2012 based upon the ratio of the highest aggregate balance for each year to the total of the highest aggregate balance for the years combined.

75.    Due to the Dobrescus' failure to timely file FBARs reporting their financial interest in the foreign bank accounts for tax years 2011 and 2012, on May 1, 2018, a delegate of the Secretary of the Treasury, in accordance with 31 U.S.C. § 5321, timely assessed FBAR penalties against them as follows:

| Total Penalty Assessment Based Off 2011 Calendar Year | | | | |
|---|---|---|---|---|
| Account | Maximum Balance | Total Penalty | Penalty allocated to Olga Dobrescu | Penalty allocated to Paul Dobrescu |
| BCV | $591,522.00 | $295,761 | $147,880.50 | $147,880.50 |
| BCGE | $963,440.00 | $481,720 | $240,860.00 | $240,860.00 |
| **TOTAL** | **$1,554,962.00** | **$771,481** | **$388,740.50** | **$388,740.50** |

| Paul Dobrescu's Apportioned Penalty Assessment Applied to 2011 and 2012 Calendar Years | | | |
|---|---|---|---|
| Account | Total Penalty | Penalty allocated to 2011 year | Penalty allocated to 2012 year |
| BCV | $147,880.50 | $74,946.00 | $77,758.00 |
| BCGE | $240,860.00 | $122,068.00 | $113,969.00 |
| **TOTAL (Rounded)** | **$388,741.00** | **$197,014.00** | **$191,727.00** |

| Olga Dobrescu's Apportioned Penalty Assessment Applied to 2011 and 2012 Calendar Years | | | |
|---|---|---|---|
| Account | Total Penalty | Penalty allocated to 2011 year | Penalty allocated to 2012 year |
| BCV | $147,880.50 | $74,946.00 | $77,758.00 |
| BCGE | $240,860.00 | $122,068.00 | $113,969.00 |
| **TOTAL (Rounded)** | **$388,741.00** | **$197,014.00** | **$191,727.00** |

76.     A delegate of the Secretary of the Treasury properly sent Paul Dobrescu, deceased, and Olga Dobrescu, deceased, notice of the liabilities for the FBAR penalties and made a demand for payment.

77.     Despite the notice and demand for payment, Paul Dobrescu, or his Estate, and Olga Dobrescu, or her Estate, has failed to pay the FBAR penalties.  As a result, Paul Dobrescu owes $436,486.92, and Olga Dobrescu owes $438,467.89, each as of February 27, 2020, plus interest and failure to pay penalties under 31 U.S.C. § 3717, and associated fees accruing from and after February 27, 2020.

78.     The 2011 and 2012 FBAR penalties assessed against Paul Dobrescu and Olga Dobrescu remain unpaid.  As a result, Cosmin Dobrescu, as the *de facto* executor or administrator of the Estate of Paul Dobrescu, deceased, and as the *de facto* executor or administrator of the Estate of Olga Dobrescu, deceased, is liable for such debts as a representative of the estates.

WHEREFORE, the plaintiff United States of America requests that the Court:

A.     Enter judgment in favor of the plaintiff United States of America and against the defendant Estate of Paul Dobrescu, deceased, and Cosmin Dobrescu, as the *de facto* executor or administrator of Estate of Paul Dobrescu, deceased, for FBAR penalties for calendar years 2011 and 2012 under 31 U.S.C. § 5321(a)(5), plus statutory additions, including interest and late-

payment penalties pursuant to 31 U.S.C. § 3717(e)(2), which totaled $436,486.92 as of February 27, 2020; statutory additions continue to accrue on an after February 27, 2020;

      B.      Enter judgment in favor of the plaintiff United States of America and against the defendant Estate of Olga Dobrescu, deceased, and Cosmin Dobrescu, as the *de facto* executor or administrator of Estate of Olga Dobrescu, deceased, for FBAR penalties for calendar years 2011 and 2012 under 31 U.S.C. § 5321(a)(5), plus statutory additions, including interest and late-payment penalties pursuant to 31 U.S.C. § 3717(e)(2), which totaled $438,467.89 as of February 27, 2020; statutory additions continue to accrue on an after February 27, 2020; and,

      C.      Award the United States of America its costs incurred in connection with this action, along with such other relief as justice requires.

                    Respectfully submitted,

                    RICHARD E. ZUCKERMAN
                    Principal Deputy Assistant Attorney General
                    Tax Division, U.S. Department of Justice

                    */s/ Jeffrey N. Nuñez*
                    JEFFREY N. NUÑEZ
                    Trial Attorney
                    Tax Division, Department of Justice
                    P.O. Box 55
                    Washington, D.C. 20044
                    Telephone:    (202) 616-5218
                    Fax:          (202) 514-5238
                    Jeffrey.N.Nunez@usdoj.gov